## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JULIUS OSULA,**                                         Chapter 7
    Debtor                              Case No. 09-19922-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**UWAGBOE ORUMWENSE-LAWRENCE,**

    Plaintiff

v.                                                       Adv. P. No. 10-1174

**JULIUS OSULA,**

    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I.      INTRODUCTION

The matter before the Court is the "Adversary Complaint Seeking Exception to Discharge" (the "Complaint") filed by Uwagboe Orumwense-Lawrence (the "Plaintiff"), both individually and as trustee of the Idada Realty Trust, against the debtor, Julius Osula (the "Debtor" or "Mr. Osula"), who is also the Plaintiff's half-brother.  Through the Complaint, the Plaintiff seeks a determination that the debt owed to him for the Debtor's alleged misrepresentations, fraud, or defalcation while acting in a fiduciary capacity and embezzlement in connection with his use of the Plaintiff's property while the Plaintiff was

1

detained by the United States Immigration and Naturalization Service (the "INS") is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and (4). The Court conducted a trial over six days on May 13 and 14, June 9, 19, 25, and June 27, 2014 at which eight witnesses testified and 36 exhibits were introduced into evidence. The Plaintiff called the Debtor as a witness during trial. The Debtor called two witnesses at trial out of order, during the Plaintiff's submission of his case, due to scheduling issues. The Debtor then presented and rested his case solely through cross-examination by his counsel.

During day two of the trial, the Court overruled the Debtor's objection to the admissibility of certain Citizens Bank monthly bank statements with respect to the Plaintiff's checking account for the years 2002 through 2006 (the "Bank Statements") proffered by the Plaintiff, some of which contained pen marks made by the Plaintiff. Following the testimony of the Citizens Bank keeper of the records, the Debtor sought reconsideration of that ruling on the ground that the Bank Statements could not be authenticated due to the age of the statements and on the ground that they were inadmissable hearsay. The Court conducted a hearing immediately prior to day three of the trial to reconsider the admissibility of the Bank Statements. Following the arguments of counsel, the Court deferred ruling on the issue until it could conduct a *voir dire* hearing at the conclusion of the trial. On days five and six of the trial, the Court conducted the *voir dire* hearing on the admissibility of the Bank Statements. At the end of the trial, the Court also considered the Debtor's separately filed motion pursuant to Fed. R. Civ. P. 52(c), made applicable to this proceeding by Fed. R. Bankr. P. 7052 (the "Rule 52(c) motion"), in which

2

he requested that a directed judgment enter in his favor because the Plaintiff failed to introduce sufficient evidence to support his claim.[1]   At the conclusion of the trial on June 27, 2014, the Court took the Complaint, the Debtor's motion for reconsideration of the admissibility of the Bank Statements and his Rule 52(c) motion under advisement.  The Court further directed the parties to file requests for findings of fact which they did on August 25, 2014.

Also, on the final day of trial, the Court allowed the Debtor's "Motion for Return of His Personal Papers" (the "Turnover Motion") as the Plaintiff testified during the trial that he had retrieved, and turned over to his lawyers, some of the Debtor's real estate records upon his release from detention.  On June 27, 2014, the Court ordered the Plaintiff to return to the Debtor all of his closing documents by July 7, 2014 and to instruct any and all of his attorneys in possession of such documents to do the same (the "Turnover Order").  Following the expiration of the July 7th deadline, both parties filed further pleadings with respect to the Turnover Order which are addressed in Section VI below.

---

[1] Rule 52(c) provides:

> **Judgment on Partial Findings**.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## II.    FACTS AND PROCEDURAL HISTORY

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on October 19, 2009. The Debtor, with leave of Court, converted his case to one under Chapter 13 on January 5, 2010, but subsequently converted the case back to one under Chapter 7 on March 25, 2010. On June 25, 2010, the Plaintiff timely filed the Complaint pursuant to 11 U.S.C. § 523(a)(2)(A) and (4) seeking an exception to discharge of a debt asserted to exist in the amount of $600,000 allegedly incurred while the Debtor was managing and operating the Plaintiff's investment properties during a period of nearly four years when the Plaintiff was detained by the INS. At the conclusion of the trial, the Plaintiff clarified that his reliance on § 523(a)(4) was limited to claims for embezzlement and/or larceny, and he expressly waived any reliance on claims for "defalcation while acting in a fiduciary capacity." *See* 11 U.S.C. § 523(a)(4). The Plaintiff failed to specifically reference "larceny" in the Complaint, but the Court nonetheless will consider it as it is clear that he was asserting claims for embezzlement and larceny under § 523(a)(4), and he addressed both claims in his post-trial Request for Findings of Fact.

III.    **FACTS ADDUCED AT TRIAL**

A. Background

The Plaintiff, who is the Debtor's older half-brother, grew up in Nigeria and moved

to the United States in 1988.  He has several children who live in Canada and Nigeria.  The

Debtor, who shares the same mother as the Plaintiff,  also grew up in Nigeria.  He moved

to the United States in 1995.  The Plaintiff assisted the Debtor in obtaining a visa and

provided him with an apartment in one of his three multi-family rental properties at the

reduced rental rate of $300 to $400 per month,[2] which the Debtor paid "intermittently"

according to the Plaintiff.  The Plaintiff testified that he could have rented that unit for

$1,100 per month.  Upon his arrival in the United States, the Debtor initially found work

as a security guard, and he also joined the Massachusetts Army National Guard from

which he derived certain benefits, including access to favorable VA mortgages.  The Debtor

also performed jobs for the Plaintiff at his properties, including cleaning, landscaping, and

snow removal for which he received no compensation other than the reduced rent for the

apartment.  The Plaintiff testified that he frequently loaned the Debtor money for car

repairs, gas and other necessities.

The Plaintiff has been, at all relevant times, the trustee of the Idada Realty Trust (the

"Trust"), a Massachusetts nominee trust under a declaration of trust dated September 21,

1995, which was the record owner of the three rental properties located at 25, 31 and 35

---

[2] The Plaintiff testified that the rental rate was $300 per month, while the Debtor
testified that the rental rate was $400 per month.

Orlando Street, Mattapan, Massachusetts (collectively, the "Properties").[3]  On August 20,

1998, the Plaintiff executed an amendment to the Trust which made the Debtor the sole

beneficiary of the Trust, although the Plaintiff testified that the Debtor did not contribute

consideration in the form of money or services.  The Debtor was the beneficiary of the Trust

at all material times.  The Plaintiff testified that he created the Trust at the request of one

of his mortgage lenders. Notwithstanding the existence of the Trust and the Debtor's status

as the sole beneficiary, the Plaintiff referred to the Properties at trial as *his*, and the Debtor

also treated the Properties as owned by the Plaintiff.   The Properties consist of 24

individual rental units, most of which the Plaintiff rents to so-called "Section 8" tenants in

conjunction with the federal government and the Boston Housing Authority ("BHA"),

which annually inspects the Section 8 rental units for determination of suitability and rental

rate.

The Trust acquired 31 and 35 Orlando Street in 1995 for approximately $100,000

each; the Plaintiff purchased 25 Orlando Street in 1998 for approximately $440,000,[4] for a

total investment of $640,000.  From 1998 through 2002, the Plaintiff resided in Unit 6 of 35

Orlando Street with Blessing Uhangho ("Blessing") and the couple's two children. The

Plaintiff testified that he paid all household expenses while the two lived together.  He also

---

[3] No evidence was introduced at trial regarding the Trust's ownership of 25
Orlando Street, although the Plaintiff maintained that the Trust was the title holder of
that property.

[4] It is unclear from the record when or if the Trust acquired legal title to 25
Orlando Street.

testified that, prior to 2002, he supported his other children in Nigeria by sending them money for needed expenses and by allowing them to keep some or part of the income he derived from investment property he owned in Nigeria.

The Plaintiff testified that he maintained two bank accounts at Citizens Bank, a checking account with an account number ending in 3226, which was an operating account used with respect to the Properties (the "Operating Account"), and a money market account with an account number ending in 4349, which the Plaintiff testified was his personal retirement account (the "Money Market Account"). The Plaintiff testified that he received his bank statements from Citizens Bank by mail at a post office box in Allston, Massachusetts for which there was a single key.

B. The Plaintiff's Detention

On December 2, 2002, the Plaintiff voluntarily made a walk-in visit to a Boston INS office to "make inquiries" about his immigration status while accompanied by his two year old daughter.  During the visit, the INS suddenly and unexpectedly took him into custody and detained him for nearly four years, releasing him on August 26, 2006.[5]   The Plaintiff called the Debtor to pick up his daughter, which he did.  Shortly after the Plaintiff was detained, he called the Debtor from the Plymouth County Sheriff's Department and asked him to operate the Properties during his absence.  He testified:

> I also talked to him about the fact that the real estate - - since I was suddenly taken away now, as my brother he should manage the properties on my

---

[5] The parties referenced both August 25 and August 26, 2006 as the Plaintiff's release date.

behalf, make sure that he collects rent, they are posted to the account and make sure he pays the bills.  And I mentioned to him that the checking account ending in 988[6] was available for him to deposit rent checks to and also that I was entrusting the properties in his care. . . .

The Plaintiff testified that after his detention, he gave the post office box key to the Debtor. According to the Plaintiff, the Debtor readily agreed to help the Plaintiff and assume management of the Properties. The Plaintiff testified that he believed the Debtor "wholeheartedly."  He also maintained that the Debtor was "doing very poorly" financially at this time.

The Plaintiff initially testified that he did not mention the Money Market Account to the Debtor and that he gave him authority to use *only* the Operating Account, which was to be used solely for the Properties.  The Debtor, on the other hand, testified that the Plaintiff *did* inform him about the Money Market Account during his detention and that he "absolutely" had been given the Plaintiff's authority to access that account. With respect to the Operating Account, the Plaintiff acknowledged that he explicitly authorized the Debtor to sign his name to checks for that account because the Plaintiff could not sign checks from detention.  The Plaintiff also testified that the Debtor had sole possession of the checkbook for the Operating Account while he was in detention.  He was adamant that no one other than the Debtor, including Blessing, was authorized to use the checkbook during his detention. No formal check signing forms were executed by the parties, but the Debtor had the Plaintiff's express verbal authority to sign his name to the Operating

---

[6] This account number differs from the Operating Account number provided by the parties at trial and appears to be an error.

Account checks during the period he was in custody.  The Plaintiff testified that this check signing authority was limited to paying "certain and necessary expenses" related to the Properties.

According to the Plaintiff, the only compensation he promised the Debtor for managing the Properties was free rent at 35 Orlando Street, instead of the previously reduced rent he had been paying. The Plaintiff testified that he felt this arrangement was fair in light of the past help he had given the Debtor, and he maintained that he trusted the Debtor to manage the Properties based upon their close family relationship.  The Debtor, on the other hand, maintained that the parties agreed early on during the Plaintiff's detention to an annual management fee of $40,000 to be paid to the Debtor in addition to the free rent at 35 Orlando Street and that there was a written letter agreement between the parties to that effect which the Plaintiff sent to the Debtor following a visit between the two. The Plaintiff denied that there was ever an oral or written agreement to provide the Debtor with such compensation for his services.  As stated above, the Plaintiff ascribed a fair rental value to the unit in which the Debtor resided of $1,100 per month.

C. Communications Between the Parties During Detention

The Debtor managed the Properties during the Plaintiff's detention and acknowledged that he issued hundreds of checks from the Operating Account, signing the Plaintiff's name during that time.  The Plaintiff asserted that approximately $600,000 of his funds were transferred during his detention without his authorization from the Operating and Money Market Accounts, including $194,500 in checks signed by the Debtor and made

9

payable directly to himself. Some of the disputed transfers related to the Properties but, the Plaintiff testified, they were made outside the scope of the instructions and authorization he gave to the Debtor. Other transfers, including all transfers from the Money Market Account, were, according to the Plaintiff, completely unrelated to the Properties and were made by the Debtor solely for his benefit or the benefit of third parties the Plaintiff did not authorize him to pay, including members of the Plaintiff's family and creditors of the Debtor.

The Plaintiff expressed his view that the Debtor "cooked the books" and misappropriated his funds, relying on the possibility that the Plaintiff would ultimately be deported: "He took . . . advantage of my situation and started stealing from me." The Debtor steadfastly maintained that everything he did with respect to the Properties during the detention period was done with the Plaintiff's knowledge, consent and authorization.

During his detention, the Plaintiff had numerous and frequent conversations with the Debtor over the telephone and during in-person visits in jail. Through these communications, the Debtor updated the Plaintiff about the status of the Properties. According to the Plaintiff, he gave the Debtor instructions concerning the Properties, including instructions for paying the adjustable rate mortgages and insurance premiums for the Properties and advice on dealing with tenants, rent collections and the BHA. During the *voir dire* hearing, the Plaintiff also testified that he reviewed and discussed bank statements with the Debtor on the phone: "He would tell me about the balance." The Debtor corroborated these discussions, stating "We [would] go over the statements on the

phone." The Debtor testified that he regularly gave the Plaintiff detailed updates about the

Properties and financial matters and that all of his actions were subject to the Plaintiff's

control and scrutiny:

> Okay. Let's clear this [sic].  He was micro-managing those properties. Okay.
>
> I was taking orders from him and I was doing everything according to his directive.
>
> <div align="center">***</div>
>
> Again, he was giving me directives.  I was taking directives from him even though he wasn't – he was not physically present, but I was executing his – whatever he asked me to do. His lawyers, money sent to his children, money sent to Blessing in Canada for three years and eight months, and so many other things --
>
> <div align="center">***</div>
>
> Well, I relate with him, then he would – I would do what he asked me to do, he authorize me [sic].  I mean everything I did was with – with his knowledge, consent and authorization.  There was nothing that was done without his knowledge. . . . I was constantly briefing him on everything that was going on . . .

The Plaintiff introduced into evidence a number of letters sent to him by the Debtor

during detention.  In addition to the letters introduced by the Plaintiff, the Debtor testified

that he sent hundreds of additional letters, that were not introduced into evidence, for the

purpose of updating the Plaintiff on day-to-day matters.  As is evident from the letters

introduced at trial, the Debtor conveyed information to the Plaintiff about the Properties

and tenant issues.  One letter provided: "All is well so far. . . . The Properties you trust in

my care [are] good." Other letters reflected that the Debtor communicated to the Plaintiff

about the Plaintiff's outstanding immigration matters and other legal problems, including

<div align="center">11</div>

issues relating to the Plaintiff's attempt to vacate his conviction for a 1995 larceny in the South Boston District Court. The Plaintiff acknowledged that he authorized the Debtor to act as a "go-between" with the immigration and criminal lawyers working on the Plaintiff's behalf during the detention. Two letters reflected that the Debtor met with and facilitated payments to the Plaintiff's lawyers.

The letters introduced at trial establish that the Debtor kept the Plaintiff informed, in a very detailed fashion, about a number of issues with respect to the Properties as well as his personal affairs, including information about tenants who were moving in and out of the Properties, the Debtor's attempt to fill apartment vacancies, the status of inspections of Section 8 units, and costs he paid for certain work and services performed. In addition, he informed the Plaintiff about payments to attorneys working on behalf of the Plaintiff, and the outcome of court proceedings relating to the Plaintiff's prior criminal conviction. In one letter, the Debtor asked the Plaintiff if he would be "willing to pay $1.00 per copy" for pages from his District Court file. The letters also provided updates about various family members. In one of the letters, the Debtor stated that a friend or relative named Austin was thankful to the Plaintiff for a gift he had made and another provided: "Eki received the money you sent through Western Union." In another letter, the Debtor provided the Plaintiff with detailed information about the status of various tenant issues, stating: "All receipts are in tact."

Significantly, two of the letters introduced into evidence contained references to "M.M." which the Debtor insisted was a reference to the Money Market Account. One

letter provided: "M.M. was 11+ due to some expenses incurred[,]" and the other similarly provided: "M.M. will be 15+ this month[,]" both apparent references to a fluctuating balance in the Plaintiff's Money Market Account.

D. <u>The Disputed Transfers-Transfers Made from the Money Market Account</u>

The Plaintiff initially testified that he gave the Debtor no information about, and no authority to access, his Money Market Account and that any transactions involving that account during his detention were done behind his back.  The Debtor contested that testimony and said that he had been given full authority to access that account during the Plaintiff's detention, that he made transfers of funds between the Money Market and Operating Accounts, and that he "constantly" updated the Plaintiff about the balance of the Money Market Account. The Plaintiff testified that at the time of his detention, in 2002, the balance of the Money Market Account was $395,644, and that the balance increased to $528,209 in February, 2005.  When he was released in 2006, the Plaintiff testified that the balance had decreased to $360,000.   Initially, the Plaintiff disputed that the "M.M." abbreviation contained in the above described letters was a reference to the Money Market Account and insisted that the reference was to the Operating Account.  Later, during further cross-examination,  he  conceded that the "M.M." abbreviation was a reference to the Money Market Account.   He also conceded that he took no steps during his detention to tell the Debtor to stop using the account or to close the account even though he was represented by a number of attorneys during that time.

The Debtor testified that he regularly transferred large sums from the Money Market

13

Account to the Operating Account and had the Plaintiff's authority to do so. The Debtor asserted that sums he spent from the Money Market Account were largely for required repair and renovation projects for the Properties, which are discussed in further detail below. He further asserted that he had written authorizations from the Plaintiff in this regard, but that the Plaintiff seized this documentation from his apartment after his release.

E. <u>The Disputed Transfers-The Gift Letter, Credit Card Payments and Other Checks Made payable to the Debtor</u>

Sometime in 2003, the Debtor applied for a mortgage to purchase real property located at 7-9 Mulvey Street in Mattapan (the "Mulvey Street property"), a building with three rental units. In connection with his mortgage application, he supplied a "gift letter" dated October 22, 2003 (the "Gift Letter") which indicated that the Plaintiff had given him the sum of $40,000 for the purchase from the Operating Account. The Debtor testified that his bank required the Gift Letter to document the source of his down payment and that he signed the Plaintiff's name to the Gift Letter as a matter of "routine" as he had done with hundreds of checks with respect to the Properties.

The Plaintiff repeatedly and adamantly testified that the Debtor forged his name to the Gift Letter as it was signed by the Debtor without the Plaintiff's knowledge or consent. He introduced two checks drawn on the Operating Account, both made payable to the Debtor, in the amount of $40,000 and $11,100, dated October 6, 2003 and November 18, 2003, respectively. Both of these checks contained the notation "Down Payment Assistance." The Plaintiff also introduced a third check, dated November 3, 2003, in the

14

amount of $11,100 made payable to Felix Osagie ("Osagie"),  a real estate broker who
helped the Debtor purchase the Mulvey Street property.[7]  The checks made payable to the
Debtor were cashed at Sovereign Bank where the Debtor maintained his accounts.   The
Plaintiff contended that the Debtor transferred $40,000 from the Money Market Account
to the Operating Account to cover the down payment referenced in the Gift Letter without
his authority.   He added that the Debtor wrote this check and the Gift Letter shortly after
hearing that the Plaintiff's immigration appeal had been denied, and that he did so
believing that the Plaintiff was going to be removed from the United States. In addition,
he maintained that he first learned of the Gift Letter after his release from detention.

The Debtor acknowledged signing the Plaintiff's name to the above described checks
and the Gift Letter. He testified that he used the funds (totaling $62,200) for a down
payment on the Mulvey Street property, to pay for renovations at the Mulvey Street
property, for Osagie's assistance and for expenses related to the Properties.[8]  The Debtor
testified that the Plaintiff was aware of his plans to buy the Mulvey Street property as well
as another property located on Westmore Street in Mattapan[9] while he was in detention
and that he previously had tried to buy his own investment property in 2000, but that the

_____

[7] The Plaintiff introduced another check made payable to the Debtor in the
amount of $3,900, dated June 16, 2004, which he said he never authorized.  *See* Exhibit
10.  Given the date of that check, it does not appear to be connected with the Debtor's
purchase of the Mulvey Street property.

[8] The portion attributable to the Properties was not quantified by the Debtor.

[9] The Debtor maintained that he never used any funds from the Money Market or
Operating Account to purchase the property at Westmore Street.

15

Plaintiff rejected the idea. Out of respect for his "senior brother," the Debtor obeyed the Plaintiff's directive at the time.

The Debtor maintained that all of the funds he used with respect to the Mulvey Street property in 2003, including the Osagie payment, constituted compensation owed to him by the Plaintiff for his management of the Properties. He testified that the Plaintiff agreed early on during his detention to pay him $40,000 a year to manage the Properties, which had become an all consuming job which required "24/7" attention from him or his wife. He added that he had to quit one of his other jobs to accommodate the demands of managing the Properties. Additionally, he maintained, he was doing more than managing the Properties for the Plaintiff: "I was tending to his legal needs[,]" with respect to his immigration and criminal cases. He testified that he attended court hearings and communicated with the Plaintiff's attorneys, as was reflected in some of the letters he sent to the Plaintiff in detention. He testified that he put his life "on hold" from 2002 to 2006 and that he and his wife were required by the Plaintiff to be constantly available to place three-way calls on the Plaintiff's behalf so that he could speak with family members and associates while concealing his detention. The Plaintiff testified that he expended thousands of dollars of the Plaintiff's funds to purchase calling cards for this purpose.

The Debtor explained the details and timing of the Mulvey Street purchase and the Gift Letter. He used approximately $60,000 in 2003, which he considered to be a full year of compensation ($40,000), and an advance of $20,000 for the upcoming year. He testified that the timing of his purchase of Mulvey Street, and his prepayment of a portion of his

compensation, was driven by the impending expiration of a favorable "no-money down" VA mortgage loan for which he was eligible due to his prior National Guard service. He further testified that he took no additional compensation for the remainder of the detention period because his "primary goal was helping [the Plaintiff] out." The Debtor's 2003 tax return, however, did not reflect that compensation as income even though his real estate broker, Osagie, also served as his tax return preparer. The Debtor maintained that he gave Osagie all relevant documents to prepare his tax returns. The Debtor claimed that the terms of his compensation were the subject of a written letter agreement between the parties. He further testified that the Plaintiff had seized that agreement, along with all of the Debtor's financial records amassed during the detention period, when the Plaintiff gained access to his apartment after his release, as discussed in more detail below.

The Plaintiff also introduced a number of additional checks, totaling $3,300, signed by the Debtor in 2003 and 2004, made payable to Citi Card and Metropolitan Credit Union which contained notations indicating they were credit card payments. The Plaintiff testified that he did not have credit card accounts with these creditors and he did not authorize payments to them. The Debtor, on the other hand, testified that he used his credit cards for many purchases relating to the Properties and that theses checks were merely "reimbursement" for those purchases.

F. The Disputed Transfers-Transfers Made for the Benefit of the Plaintiff's Family Members

In January of 2003, shortly after the Plaintiff's detention, Blessing left the United

States with her children for Canada due to apparent problems with her immigration status. The Plaintiff believed that she left the United States at the Debtor's urging, and he did not become aware of this until after his release. The Plaintiff introduced a number of checks (totaling approximately $10,000) drawn on the Operating Account which, he maintained, the Debtor signed and which were made payable to the Debtor or Blessing. The Debtor asserted at trial that it was Blessing, and not he, who had signed the Plaintiff's name to the checks made payable to Blessing as she still lived in the Plaintiff's apartment and had access to the checkbook at that time. The Plaintiff acknowledged at trial that the signatures appearing on the checks made payable to Blessing differed from the Debtor's "signature" of the Plaintiff's name. Nevertheless, the Debtor also testified that he gave Blessing additional funds through money orders or Western Union money transfers on a monthly basis during the detention period at the Plaintiff's direction. This required him, he testified, to write checks to himself from the Operating Account and then purchase money orders or set up Western Union money transfers because she could not cash a U.S. check in Canada. The Plaintiff testified that he did not authorize the issuance of funds to Blessing who, he said, "did not need money" because she was working and because "there was no court order[ed] child support payments" even though he paid all of the household expenses prior to his detention. He testified he was "stunned" that the Debtor issued checks giving money to Blessing while he was in detention and that he never sought the Plaintiff's permission for this even though Blessing was managing the household and caring for their children during his absence.

18

The Debtor also made multiple transfers to the Plaintiff's other family members, children, and associates.  Again, he testified that he was required to write checks to himself from the Operating Account and then purchase money orders or set up Western Union money transfers as many of the recipients lived outside of the United States.  He testified that he did all of this with the Plaintiff's knowledge and approval.  The Plaintiff testified that he was not aware of the transfers until after he was released.  Specifically, he said that he did not authorize the issuance of funds to the mothers of his children in Nigeria during his detention, despite his prior practice of doing so, because they had the benefit of his Nigerian investment property and because "the kids have their mothers to take care of them." Nonetheless, one of the letters introduced at trial reflected that the Debtor informed the Plaintiff that one of his sons in Nigeria needed $40 for "exams, books, clothes and school." The Plaintiff also conceded at trial that he did not report the income he received from the Nigerian investment property on his 2006 tax return.

G. The Disputed Transfers-Checks Made Payable to Contractors and Other Third Parties

The Plaintiff testified that he and the Debtor did not discuss repairs to the Properties during his detention, stating, "We never discussed repairs or upgrades because I had managed the properties for so long.  I lived on the properties, and I gave the properties every unit the best care  . . . . " He added that there were no major BHA inspection problems at the Properties prior to his detention and that they were in "very good condition" in 2002.  From 2002 through 2006, while he was in detention, the Plaintiff

19

testified that he did not believe the Properties required any upgrades or renovations, and he was unaware of any repairs made by the Debtor during that time.

The Debtor, conversely, testified that at the time of the Plaintiff's detention, in late 2002, the condition of the Properties was "terrible." He testified that he had to make numerous repairs, renovations, and purchases, including large appliances which he frequently bought with cash or with his credit card, reimbursing himself with checks from the Operating Account. He hired a number of professionals for the repairs. A carpenter and an electrician testified; each had over 40 years experience in their respective trades. Al Watts ("Watts"), an electrician, testified that he made numerous trips to the Properties at the request of the Debtor from 2002 through 2006 to replace the fuse boxes, install smoke detectors as required by law, and to work on the wiring. He credibly testified that the work he performed was necessary and appropriate.

Patrick Cedeno ("Cedeno"), a carpenter, testified that he performed work for the Plaintiff at the Properties for several years prior to the Plaintiff's INS detention and that he performed work at the Debtor's request while the Plaintiff was detained. He testified that there were a number of maintenance problems at the Properties during the Plaintiff's absence, particularly at 25 Orlando Street which was plagued with flooding problems. He stated that he made weekly service calls to the Properties to deal with the flooding and to handle inspectional issues raised by the BHA. On one occasion, an inspector informed Cedeno that a roof leak at 31 Orlando Street needed to be fixed or the inspector would shut down the building. According to Cedeno, the Debtor often negotiated for a lower price

20

than what he was quoted and always had to check with the Plaintiff prior to agreeing on a final price. Cedeno credibly testified that the Properties suffered from a number of problems, including rotting floors, mold, and windows which were not up to code, all of which required numerous service calls.   In Cedeno's opinion, 25 Orlando Street would have been condemned by the Board of Health if not for the Debtor's work.  When asked at trial whether the Debtor took good care of the Properties from 2002 through 2006, Cedeno said that if it had not been for the Debtor's efforts, "there would not have been any 25 and most likely 31 Orlando [Street]" and that the Debtor "gave his heart and soul" to preserve the Properties from 2002 to 2006.  He asserted that all the work he performed during this time was necessary and done pursuant to orders from the Boston Housing Inspectional Services Department.

The Plaintiff introduced ten checks issued to Ken Matthews or Matthews Flooring, totaling $13,468, with notations indicating that the payments were made for "carpets" at the various Properties.  The Plaintiff testified that the payments made to Matthews were unauthorized because he only used hardwood floors and ceramic tiles at the Properties and alleged that the transfers made to Matthews Flooring were fraudulent for that reason. The Debtor introduced a number of invoices and receipts issued by a former employee of Matthews Flooring, Joseph J. Maguire ("Maguire").  Maguire supervised the Matthews Flooring crews that worked at the Properties during the Plaintiff's absence, and Maguire also did work as the owner of his own contracting company after he left Matthews Flooring in 2004.  Maguire credibly testified that all of the work reflected in the invoices, receipts

and checks was actually performed and necessary as "the property was in shambles." He added that the Debtor did his "utmost to try to clean the properties up" and that the Properties had a "terrible reputation with the Boston Housing Authority" which the Debtor was able to change by "cleaning the properties up and doing the work that needed to be done."

The Plaintiff also introduced $1,750 in checks, issued in 2004 and 2005, made payable to Tony Blaize, an individual he said he did not know. He testified that he did not authorize those payments and did not know the purpose of the payments. He later conceded during cross-examination, however, that Tony Blaize ("Attorney Blaize") was one of the attorneys engaged on his behalf by the Debtor to vacate his larceny conviction. He attributed his confusion to faulty memory and the lack of a notation or memo on the checks in question. Nonetheless, the Plaintiff still insisted at trial that the Debtor should refund him the monies paid to Attorney Blaize.

Lastly, the Plaintiff introduced two checks made payable to the Debtor in the amount of $2,500 each, dated August 17, 2004 and October 20, 2004. One check contained the notation "Gift" while the other contained no notation. The Plaintiff testified that the Debtor's issuance of these checks was unauthorized and that he never gave the Debtor a gift during his detention.

In addition to the transfers described above which the Plaintiff supported with cancelled checks, he made reference at trial to other allegedly unauthorized transfers from the Operating Account which he did not support with cancelled checks. One of these was

a $60,000 transfer from the Operating Account to the Debtor in May of 2005, which the

Debtor testified was spent on the Properties and not for his personal use. The Plaintiff also

alleged additional unauthorized transfers from the Operating Account to Osagie, in

addition to the November 3, 2003 payment described above. As discussed further below,

the Court will assess the allegations concerning these transfers in the context of the parties'

credibility.

H.     The Plaintiff's Release from Detention

On August 26, 2006, without any advance notice, the INS released the Plaintiff from

detention. Upon his release, the Plaintiff immediately called the Debtor who picked him

up. They had dinner together and, according to the Plaintiff, the mood was "reserved."[10]

The Plaintiff testified that, upon his release, he learned for the first time that the Debtor had

purchased a new home at 74 Westmore Street, Mattapan (the "Westmore Street property")

during the Plaintiff's detention. During dinner, the Plaintiff testified, the Debtor advised

him that everything "was fine" at the Properties, and the Debtor promised to give the

Plaintiff records relating to the Properties that he had maintained during the detention

period, but that he failed to do so.

Within days of his release, the Plaintiff grew suspicious of the Debtor's actions

during his absence and took steps to obtain the records he had requested. The parties'

version of events about the Plaintiff's retrieval of the records and subsequent events

---

[10] The Plaintiff testified that the dinner occurred at the Debtor's home on
Westmore Street in Mattapan, while the Debtor testified that the dinner occurred at a
local restaurant.

diverged significantly.  The Plaintiff, on the one hand, maintained that he retrieved records relating to the Properties, including some original bank statements,  as well as some of the Debtor's personal records relating to the Mulvey and Westmore Street properties from the Plaintiff's old apartment in Unit 6 of 35 Orlando Street.  The Debtor, on the other hand, maintained that the Plaintiff gained access to *his* apartment in Unit 1 of 35 Orlando Street[11] without his permission and stole all of his records from there, including receipts relating to the Properties and the Debtor's personal financial records relating to the Mulvey and Westmore Street properties.  The Debtor further maintained that the Plaintiff never returned his personal records to him, including the receipts which would have substantiated his expenditures on the Properties from 2002 to 2006.  As discussed above, due to the Plaintiff's testimony that he had retrieved some of the Debtor's records, the Court entered the Turnover Order on the final day of trial.

During direct testimony, the Plaintiff testified that upon seeing some of the records, he grew concerned and rushed to the bank: "I found out that on the date I was released, on August 25, 2006, while [we] were having dinner, at that time he had gone to call Citizens Bank . . . and transferred $10,000 from my [Money Market] account . . . ."  On cross-examination, however, when shown portions of a prior deposition transcript, the Plaintiff acknowledged that the disputed $10,000 transfer from the Money Market Account occurred on August 14, 2006, two weeks prior to his release.

_____

[11] Although the Debtor was residing at the Westmore Street property, he still maintained an apartment at Orlando Street.

24

I. The State Court Action

Shortly after his review of the financial records from Citizens Bank, the Plaintiff concluded that the Debtor had stolen from him during his detention. The Plaintiff claimed that the Debtor admitted that he had stolen from him during a meeting they attended with their cousin on an unspecified date to "mediate" their dispute.  According to the Plaintiff, no resolution of the dispute was achieved, and the Plaintiff filed a Verified Complaint against the Debtor on September 13, 2006 in the Suffolk Superior Court in which he asserted claims for, *inter alia*, conversion, fraud, breach of contract, unjust enrichment, and violations of Mass. Gen. Laws ch. 93A.  The case was eventually stayed by the Debtor's bankruptcy filing in 2009.  There was no reference to the mediation meeting in the Verified Complaint, and the Plaintiff produced no evidence at trial, in the form of answers to interrogatories, testimony of witnesses or otherwise, that the alleged mediation took place or that the Debtor previously confessed to stealing the Plaintiff's money.

In connection with the state court action, the Debtor signed an affidavit on October 23, 2006 which provided, consistent with his trial testimony, that the Plaintiff authorized him to withdraw funds from the Money Market Account for repairs and improvements and that the Debtor was unable to produce documentation on the expenditures because the Plaintiff removed all records from his apartment.   The Debtor also attested in the affidavit that he withdrew $40,000 from the Money Market Account to purchase the Mulvey Street property, but that he did so with the Plaintiff's authorization and pursuant to a written compensation agreement.

J. 2008 Transactions

In April, 2008, less than two years after the Plaintiff was released from detention, the Plaintiff, as Trustee of the Trust, sought to refinance the mortgages on 31 and 35 Orlando Street to obtain a loan for $1.8 million.  Although the Plaintiff signed a Trustee's Certificate on April 30, 2008, indicating that he had the authority of the Trust beneficiary, i.e., the Debtor, to obtain the loan, he testified at trial that he did not obtain the Debtor's authority for the transaction. Also on April 30, 2008, the Plaintiff, as Trustee, purported to deed 31 and 35 Orlando Street to himself, individually, for $1.  He did not seek or obtain authorization from the Debtor, as the sole beneficiary of the Trust, for the transfer.  He also testified that he did not share any of the rental income generated by the Properties with the Debtor during the time the Properties were owned by the Trust.

IV.     POSITIONS OF THE PARTIES

A. The Plaintiff

With respect to his claims for embezzlement under § 523(a)(4), the Plaintiff asserts that they are "premised upon the [Debtor] writing scores of checks to himself, unauthorized individuals, and forging documents to cover his tracks." With respect to his claims for larceny under that section, the Plaintiff submits that all transfers made by the Debtor from the Money Market Account during the Plaintiff's detention constitute larceny because the Debtor "was never in lawful possession or had access to this . . . [account]." He asserts that the Debtor committed a larceny every time he transferred funds from the Money Market Account to the Operating Account and then committed an embezzlement

26

when he took the money from the Operating Account for himself and his "accomplices."
He claims that the trial testimony and the Bank Statements establish that the Debtor
perpetrated this "scheme" many times.

With respect to the Plaintiff's claims under § 523(a)(2)(A), he maintains the Debtor
intentionally made both oral and written misrepresentations to him during his detention
when the Debtor accepted the entrustment of the Properties, including representations that
he would honestly manage the day-to day operations of the Properties and that things were
going well with the Properties while he was simultaneously "funneling money" away for
his own personal use and for third parties.  The Plaintiff asserts that the Debtor intended
to deceive him, and that he actually and justifiably relied on the Debtor's assurances to his
detriment based upon their long family history.

The Plaintiff makes several references in his Request for Findings of Fact to the Bank
Statements and again argues in support of their admissibility.  He did not, however,
explain the relevance of any particular entries in the Statements or how he arrived at the
figures he asserted at trial for the total amount taken by the Debtor without his
authorization ($600,000) or the total amount of checks issued directly to the Debtor
($194,500).

B. The Debtor

The Debtor maintains that the Plaintiff testified untruthfully and failed to meet his
burden of proving that his claim is nondischargeable under § 523(a)(2)(A) and (4).  He
contends that all expenditures made by the Debtor from the Money Market and Operating

Accounts, including payments made to family members, contractors and credit card companies were made with the Plaintiff's approval.  Additionally, the Debtor maintains that he is the true owner of the Properties as he is the sole beneficiary of the Trust, notwithstanding the Trust's purported 2008 transfer of 31 and 35 Orlando Street to the Plaintiff, which was done without the Debtor's consent.  Accordingly, he argues, the Debtor committed no actionable harm to the Plaintiff.

With respect to the $62,200 expended by the Debtor on Mulvey Street, the Debtor acknowledges that all of these funds came from the Money Market Account, but he claims that all such amounts constituted compensation for managing the Properties during the Plaintiff's absence. He argues that this amount, which is much less than half of what he would have been entitled to for four years of compensation ($160,000), was both authorized by the Plaintiff and appropriate in light of the substantial duties assumed by the Debtor during the Plaintiff's detention, which included management of the Properties and the Plaintiff's personal and legal affairs.  Indeed, the Debtor argues that his duties during the Plaintiff's detention period were "enormous and all consuming" and subject to the constant control and scrutiny of the Plaintiff.

## V.   DISCUSSION

### A. Preliminary Matters and Evidentiary Rulings

As a preliminary matter, the Court rules that the Bank Statements are admissible and denies the Debtor's motion to reconsider their admissibility and exclude them. Accordingly, the Court shall consider the Bank Statements in reaching its findings of fact

and conclusions of law.  Based upon the evidence adduced at the trial and the *voir dire* hearing, as well as a review of the Bank Statements, the Court finds that the proffered Bank Statements have been properly authenticated.  There was reliable testimony from the Citizens Bank keeper of the records that the statements proffered were indeed Citizens Bank statements.   There was no convincing rebuttal evidence introduced by the Debtor that the documents were not records of Citizens Bank, or that they were tampered with or altered in any way.  The Court disregarded the pen marks made by the Plaintiff on the Statements.   The Court is convinced of the trustworthiness of the documents.  *See* Fed. R. Evid. 807.

The Court finds that the Bank Statements establish that checks were issued from the Operating Account, transfers were made in and out of the Operating Account to and from the Money Market Account during the Plaintiff's detention period and that the balance of the Operating Account was necessarily affected by those transfers.  Beyond that, however, they are of little explicative value as the Plaintiff failed to explain at trial, during the *voir dire* hearing, or in his post-trial Request for Findings of Fact how the Bank Statements substantiate his asserted total claim against the Debtor ($600,000) or the total amount of Operating Account funds Mr. Osula purportedly misappropriated for himself ($194,500). Moreover, they do not demonstrate the impropriety of any of the disputed transfers, including the $60,000 transfer from the Operating Account in May, 2005.

As another preliminary matter, the Court rejects the Debtor's affirmative defense that *he* was the true owner of the Properties in his capacity as the sole beneficiary of the

Trust and that he accordingly committed no actionable harm to the Plaintiff. The evidence adduced at trial establishes that both parties disregarded the existence and formalities of the Trust and both treated the Plaintiff as the true owner of the Properties.[12]

"'Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy,'' and, for that reason, the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'" Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)(quoting Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)). A plaintiff is required to establish both that he has a valid claim against a debtor *and* that the claim should not be discharged in bankruptcy. Palmacci, 121 F.3d at 786. The plaintiff bears the burden of proving each and every element of an exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).

The Court notes the crucial role of the parties' credibility in determining whether the Plaintiff sustained his burden as the parties' versions of events often directly conflicted with respect to details, both large and small. Their divergent views of events is unsurprising in light of the complicated subtext of their relationship. Beneath the Plaintiff's allegations is his conviction that his brother, whom he trusted and financially supported during his time of need, exploited the Plaintiff's absence to unjustly enrich himself. The Debtor, on the other hand, considered himself a dutiful and dedicated brother entitled to

---

[12] This conclusion has no bearing on the Chapter 7 Trustee's duties pursuant to 11 U.S.C. § 704 in the Debtor's bankruptcy case.

reasonable compensation for his years of servant-like devotion to his controlling, older

brother. As discussed below, both parties exhibited a lack of veracity on different matters

at different points during the trial. Although the Debtor did not acquit himself of all

allegations, the Plaintiff failed to meet his burden of proof with respect to the bulk of his

claims. "When the weight of the evidence is in equipoise, a party cannot plausibly be said

to have carried the devoir of persuasion." deBenedictis v. Brady-Zell (In re Brady-Zell), 756

F.3d 69, 72 (1st Cir. 2014)(citing Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 45 (1st Cir.

2013)).

     B. Applicable Law-Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that a discharge does not

discharge an individual debtor from any debt "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4). This subsection is

comprised of three separate causes of action: (1) fraud or defalcation while acting in a

fiduciary capacity, (2) embezzlement, and (3) larceny.

At the conclusion of the trial, the Plaintiff expressly waived any reliance on fraud

or defalcation while acting in a fiduciary capacity. Thus, the Court must determine

whether the debt owed to the Plaintiff, if any, arose through embezzlement or larceny. The

United States Court of Appeals for the First Circuit in Sherman v. Potapov (In re Sherman),

603 F.3d 11 (1st Cir. 2010), examined the standard for embezzlement in the context of §

523(a)(4) involving entrusted funds:

There being no definition of embezzlement in § 523 or elsewhere in the

> Bankruptcy Code, we assume that Congress wrote with the common law in mind, <u>Neder v. United States</u>, 527 U.S. 1, 23, 119 S. Ct. 1827, 144 L.Ed.2d 35 (1999), and <u>United States v. Young</u>, 955 F.2d 99 (1st Cir. 1992), will suffice for an explanation of the traditional elements of embezzlement [sic]. Embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of it." <u>Id</u>. at 102 (internal quotation marks omitted). Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent. . . .

<u>Sherman</u>, 603 F.3d at 13. In <u>Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)</u>, 459 B.R. 394 (Bankr. W.D. Mo. 2011), the court explained the distinction between embezzlement and larceny under § 523(a)(4): "Embezzlement . . . differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking." <u>Id</u>. at 406 (quoting 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. rev.)). As the courts recognized in <u>Adamo v. Scheller (In re Scheller)</u>, 265 B.R. 39, 53 (Bankr. S.D. N.Y. 2001), and <u>Great American Ins. Co. v. Graziano (In re Graziano)</u>, 35 B.R. 589, 594 (Bankr. E.D. N.Y. 1983), what constitutes larceny for purposes of § 523(a)(4) is a question of federal law. "Larceny is the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property." <u>Scheller</u>, 265 B.R. at 53; <u>Graziano</u>, 35 B.R. at 594.

C. <u>Analysis-Section 523 (a)(4)</u>

The Plaintiff's claim for larceny fails under § 523(a)(4) as the evidence presented at trial does not support the Debtor's wrongful taking of the Plaintiff's property without his consent, i.e., the funds from the Money Market Account. To the contrary, the evidence supports the Debtor's contention that he used that account with the Plaintiff's full

knowledge and consent. The Debtor credibly testified that he "constantly" updated the Plaintiff about the balance of the Money Market Account.  That testimony is supported by the letters introduced at trial, which reflect that the Debtor advised the Plaintiff about the fluctuating balance of that account and that it was affected by "expenses incurred."

The Plaintiff's testimony, on the other hand, was marked by contradictions and was irreconciliable with the evidence *he* introduced.  He initially testified that he never mentioned the Money Market Account to the Debtor, but he later conceded during cross-examination that the "M.M." reference contained in the letters was a reference to the Money Market Account.  Moreover, the Plaintiff testified that he gave the Debtor the sole key for the post office box to which Citizens Bank statements were mailed.  It is reasonable to conclude that the Plaintiff was fully aware that the Debtor had access to the Money Market Account information and records when he gave him control of the post office box. The Plaintiff's attempt to claim otherwise casts doubt on the credibility of all of his testimony in this regard.

Other facts established at trial also support the Debtor's contention that the Plaintiff entrusted him with the Money Market Account.  Both parties testified that they reviewed bank statements while the Plaintiff was in detention.  The Plaintiff, who was familiar with the amount of monthly rental income generated by the Properties, would have been aware when the Operating Account balance was affected by transfers to and from the Money

33

Market Account.[13]    Indeed, the Bank Statements offered by the Plaintiff reflect that a

number of deposits and withdrawals were made between the two accounts which would

have affected the monthly Operating Account balance.  Had these fluctuations seemed

improper to the Plaintiff, he could have taken any number of steps to prevent or restrict the

Debtor's access to the Money Market Account as the Plaintiff was represented by a number

of attorneys during his detention.  He failed to do so.  Also, the Plaintiff testified that the

balance of the Money Market Account rose and fell during his detention, which is

consistent with the Debtor's contention that he was moving funds in and out of that

account as income and expenses associated with the Properties dictated. The Plaintiff may

dispute the propriety of the expenditures made by the Debtor with Money Market Account

funds, which is discussed below with respect to his claims for embezzlement, but the

record solidly supports the Debtor's lawful access to that account, i.e., with the Plaintiff's

consent.  Accordingly, the Court finds that the Plaintiff did not sustain his burden with

respect to his claims for larceny pursuant to 11 U.S.C. § 523(a)(4).

The Court turns next to the Plaintiff's claims for embezzlement under § 523(a)(4).

As discussed by the Court in Sherman, "using entrusted money for the recipient's own

purposes in a way he knows the entrustor did not intend or authorize" constitutes

embezzlement. Sherman, 603 F.3d at 13 (citing United States v. Young, 955 F.2d 99, 102 (1st

Cir. 1992)).  "It is knowledge that the use is devoid of authorization, *scienter* for short . . .

---

[13] The Plaintiff introduced no evidence at trial that the funds in the Money
Market Account were attributable to any source other than the rent rolls from the
Properties.

that makes the conversion fraudulent and thus embezzlement . . . "  <u>Sherman</u> at 13 (emphasis in original) (citing <u>Palmacci</u>, 121 F.3d at 786).   To find the Debtor an embezzler for purposes of § 523(a)(4), the Court must conclude that he used Money Market and Operating Account funds in a manner he knew was unauthorized by the Plaintiff.  For the bulk of the Plaintiff's allegations, he provided little evidentiary support for this determination, other than his own testimony which was frequently rambling, imprecise, affected by faulty memory and contradicted by the testimony of credible witnesses and documentary evidence. The Court will examine each category of the disputed transfers in turn below.

With respect to payments made to Blessing and the Plaintiff's children, the Court finds that these transfers did not amount to embezzlement of the Plaintiff's property by the Debtor as they were consistent with the Plaintiff's pre-detention practices.  Additionally, the evidence indicates that the Debtor communicated with the Plaintiff during detention about the financial needs of family members and gifts and payments to third parties known by the Plaintiff.  The Plaintiff's contention at trial that he did not authorize support payments to his children during his detention because there were no child support orders and because "the kids have their mothers to take care of them" was unconvincing and implausible in light of his testimony that he supported them before his detention. With respect to payments sent directly to Blessing by the Debtor, the Court finds that those payments were also within the scope of the Plaintiff's pre-detention practice of paying the household expenses while Blessing and her children lived in the United States.  With

35

respect to the checks made payable directly to Blessing, the Court finds support for the Debtor's contention that it was Blessing, and not he, who signed those checks because she had access to the Plaintiff's apartment and possessions at the time the checks were issued. Moreover, the signatures on those checks differed from those of the Debtor. Despite the Plaintiff's protestations that Blessing could not have signed those checks, his absence necessarily precluded oversight of check signing.

With respect to payments alleged to have been made by the Debtor to other family members and associates, the Court does not find credible the Plaintiff's assertions that he never authorized payments to relatives and associates. Some of the checks introduced at trial contained notations with the names of the Plaintiff's relatives. Additionally, some of the letters referenced individuals who needed money from the Plaintiff or who had already received funds or gifts from him. It is reasonable to conclude that the Debtor accessed the Operating Account to make financial support payments or gifts at the Plaintiff's direction. Indeed, one check introduced by the Plaintiff, made payable to the Debtor, was noted with the word "Gift." The Plaintiff cannot justifiably claim that he was "stunned" to learn of these transfers. Indeed, it is hard to imagine why the Debtor would have made payments to relatives and associates of the Plaintiff other than at his direction as these transfers did not benefit the Debtor.

With respect to transfers made by the Debtor to contractors, Matthews Flooring, Attorney Blaize and certain credit card companies, the Plaintiff's claim that these payments were not authorized or inconsistent with the required management and operation of the

Properties is against the formidable weight of the evidence presented. The Plaintiff testified that the Properties were in "very good condition" in 2002, that they did not require any renovations and that he did not discuss repairs or upgrades with the Debtor during his detention. Those contentions are incompatible with the credible testimony of the experienced contractors, the BHA's annual inspection requirements and with the demands of managing a 24-unit residential complex where each apartment required separate appliances and maintenance. Watts testified that he performed significant work at the Properties that was necessary and appropriate and that he made numerous trips to the Properties from 2002 to 2006. Likewise, Cedeno testified that he made frequent trips to the Properties during the detention period to address serious concerns raised by the BHA. Notably, Cedeno testified that some of the Properties would have been condemned or otherwise lost due to their poor condition had the Debtor not stepped in to make the needed repairs. Similarly, Maguire testified that the Properties were "in shambles" and had a "terrible reputation" with the BHA. The Plaintiff's own testimony reflected that the value of the Properties appreciated significantly from the 1990s to 2008, less than two years after his release from detention.

Both Cedeno and Maguire emphatically credited the Debtor's property management skills and efforts to bring the Properties into compliance with BHA mandates, thereby preserving the Plaintiff's investment and source of income. Moreover, the Plaintiff's description of the condition of the Properties cannot stand up to the credible assessment offered by Watts, Cedeno and Maguire, and the Court questions the Plaintiff's ability to

advance an accurate and updated opinion of what constituted necessary and appropriate repairs due to his four year absence from the Properties.  For all of these reasons, the Court finds that amounts expended by the Debtor from the Money Market and Operating Accounts  for contractors and materials were necessary, appropriate and consistent with the Plaintiff's directives to manage the Properties.

With respect to the payments made by the Debtor from the Operating Account to his credit card companies, the Court finds that these payments were also within the scope of the Plaintiff's instructions to manage the Properties.  The Debtor credibly testified that he wrote these checks to Citi Card and Metropolitan Credit Union to pay for items he personally charged relating to the Properties. Additionally, he also issued checks to himself as reimbursement for purchases made for the Properties.  While the Debtor was unable to substantiate his statement with receipts, the testimony of the contractors established that the Properties required significant upkeep and expenditures, and the Debtor also reasonably and credibly explained that he was prevented from supplying receipts due to the Plaintiff's seizure of his records following his release from detention.   Given the Debtor's communication to the Plaintiff about keeping receipts, as documented in one of the letters introduced at trial, the Court concludes that the Debtor did, at some point, maintain records of his expenditures on the Properties.  The Plaintiff failed to establish that the transfers to the credit card companies were not within the scope of the Plaintiff's direction to manage and maintain the Properties.

The Plaintiff's assertion that payments to Attorney Blaize were unauthorized and

ought to be refunded to him are completely without merit as he conceded at trial that Attorney Blaize was an attorney engaged on his behalf to move to vacate his criminal conviction. The Plaintiff's allegations against the Debtor with respect to these payments highlight the weak foundation upon which the bulk of his claims rest. The great weight of the evidence supports the conclusion that the Debtor diligently managed the Properties and the Plaintiff's affairs under the constant scrutiny of the Plaintiff who, although not physically present, exerted considerable control over the Debtor. The record is replete with examples of this control. The letters the Debtor wrote to the Plaintiff while he was detained reflect that the Debtor routinely updated the Plaintiff with detailed information about all facets of his business and personal affairs, at one point inquiring whether the Plaintiff would be willing to pay $1.00 per page for copies of his case file. Cedeno testified that the Debtor always had to check with the Plaintiff prior to agreeing on the price for necessary services. Additionally, the Debtor testified that he and his wife made themselves constantly available to place three-way calls on the Plaintiff's behalf so that he could speak with family members who did not know that he was being held in INS custody. Further, the record establishes that the Debtor undertook his responsibilities seriously and with dedication as attested to by Cedeno: "[he] gave his heart and soul" to preserve the Properties, and Maguire: "[he did his] utmost to try to clean the properties up."

The evidence strongly supports that all actions taken and expenditures made by the Debtor from the Plaintiff's funds, except as set forth below, were consistent with the efficient and diligent management of the Properties and the Plaintiff's other affairs and

were in furtherance of the Plaintiff's best interests.[14] The Plaintiff failed to establish by a

preponderance of the evidence the existence of *any* debt or claim against the Debtor arising

from the disputed transfers discussed above, let alone one which would constitute a

nondischargeable debt for embezzlement pursuant to § 523(a)(4).

The Debtor's execution of the Gift Letter and his use of $62,200[15] of the Plaintiff's

funds in 2003 to purchase and improve the Mulvey Street property raise the only serious

question in this case as to whether the Debtor used the Plaintiff's monies for his own

benefit in a manner the Plaintiff did not authorize.  The Debtor maintained that these funds

constituted compensation payable to him pursuant to a written letter agreement under

which the Plaintiff agreed to pay him $40,000 per year for managing the Properties.  The

Plaintiff maintained that the only compensation he agreed to pay the Debtor was "free

rent" at 35 Orlando Street.  The Plaintiff vehemently denied that he ever authorized the

purported Gift Letter or the Debtor's use of his funds to purchase the Mulvey Street

property, and he frequently reiterated this throughout his multiple days of testimony.

---

[14] With respect to the $60,000 transfer made from the Operating Account in May, 2005, which the Plaintiff did not support with a cancelled check, the Court finds that the Plaintiff did not sustain his burden of showing the impropriety of that transfer or that those sums were not legitimately used by the Debtor for the care and maintenance of the Properties.

[15] As discussed above, the Debtor issued himself checks for $40,000 and $11,100 on October 6, 2003 and November 18, 2003, respectively, both containing the notation "Down Payment Assistance," and he issued one check for $11,100 to Felix Osagie on November 3, 2003, for a total of $62,200.  The Court will not consider the Plaintiff's vague and unsubstantiated allegations about additional transfers made to Osagie other than those which are supported by cancelled checks introduced at trial.

The evidentiary record supports the Debtor's contention that the day-to-day management of the Properties and the Plaintiff's legal and personal affairs constituted a significant undertaking. The Court, however, is unable to conclude, due primarily to the absence of details offered by the Debtor, that the Plaintiff authorized the Debtor to execute the Gift Letter and to pay himself $62,200 in 2003 as compensation for his services. The Debtor's explanation of the terms and circumstances surrounding the alleged compensation agreement was vague and unconvincing. First, the Debtor gave no details about the date the parties executed the alleged agreement, how they arrived at the annual compensation figure or why $40,000 was a reasonable annual fee for such services in addition to the free apartment whose rental value, according to the Plaintiff, was $13,200 per year. Second, the Debtor did not convincingly or coherently explain why he did not pay himself for every year of service or why he did not pay himself in regular weekly or monthly increments. He took his "compensation" only in 2003 and did not seek payment of the balance allegedly owed to him, which would have been nearly $100,000 if the parties had entered into this arrangement at the outset of the Plaintiff's detention. Further, the Debtor failed to adequately explain why he did not report this "compensation" as income on his tax return, especially when his tax preparer personally received some of the funds. Additionally, the Debtor's need for a $40,000 down payment or a gift letter would seem questionable in light of the fact that he had secured a "no-money down" VA subsidized mortgage loan. Lastly, it is hard to fathom why the Plaintiff would have entered into any sort of annual agreement at the outset of his detention because he was unsure how long his

41

detention would last.

In light of all of the irregularities in the Debtor's explanation, the most likely scenario is that the Debtor took what *he* determined was reasonable compensation for his work on the Plaintiff's behalf without consulting him. His actions were opportunistic and his explanation was contrived. The Court concludes that the Debtor's allegation of the existence of a written compensation agreement is not credible, supported by the evidence, or consistent with his actions. The Court expressly rejects the Debtor's allegation that a written agreement was stolen from him by the Plaintiff. The Court finds that the Plaintiff's testimony with respect to the one narrow issue concerning the Debtor's use of funds for the Mulvey Street property is credible and bolstered by the Debtor's dubious account of events. The Plaintiff sustained his burden of proof that the Debtor used $62,200 entrusted to him by the Plaintiff for the Debtor's own benefit and in a manner he knew the Plaintiff did not intend or authorize. Accordingly, the debt is nondischargeable as arising from an embezzlement pursuant to 11 U.S.C. § 523(a)(4).

D. Applicable Law-Section 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge a *debt of an individual debtor* "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by — (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A)(emphasis added).

The United States Court of Appeals for the First Circuit in <u>McCrory v. Spigel (In re</u>

Spigel), 260 F.3d 27 (1st Cir. 2001) articulated the following requirements for establishing

an exception to discharge under section 523(a)(2)(A):

> [I]n order to establish that a debt is nondischargeable because obtained by
> "false pretenses, a false representation, or actual fraud," we have held that
> a creditor must show that 1) the debtor made a knowingly false
> representation or one made in reckless disregard of the truth, 2) the debtor
> intended to deceive, 3) the debtor intended to induce the creditor to rely
> upon the false statement, 4) the creditor actually relied upon the
> misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance
> upon the false statement caused damage.

Spigel, 260 F.3d at 32 (footnote omitted)(citing Palmacci, 121 F.3d at 786.  The Spigel court,

further stated: "Though the first two elements of the Palmacci test describe the conduct and

scienter required to show fraudulent conduct generally, the last four embody the

requirement that the claim of the creditor arguing nondischargeability in an adversary

proceeding  must arise as a direct result of the debtor's fraud." Spigel, 260 F.3d at 32

(footnote omitted). "A creditor arguing for an exception to nondischargeability must prove

all six elements; if her proof falls short on any element, her quest for nondischargeability

fails." In re Brady-Zell, 756 F.3d at 72 (citing Spigel, 260 F.3d at 32).

   E. Analysis-Section 523(a)(2)(A)

   As discussed above, the Plaintiff failed to establish any liability on a claim arising

from the Debtor's actions, other than a claim for $62,200 for the funds the Debtor

embezzled to purchase and improve the Mulvey Street property (hereinafter, the

"Embezzlement Claim"). Having determined that the Embezzlement Claim is

nondischargeable under § 523(a)(4), the Court need not determine whether it is also

nondischargeable under § 523(a)(2)(A). The Plaintiff has no further cause of action under § 523(a)(2)(A) due to the absence of a debt, as required by the precatory language of the statute. Moreover, the Plaintiff did not prove, with respect to the non-Embezzlement Claims, that the Debtor made misrepresentations with intent to deceive on which he actually and justifiably relied to his detriment. There was no evidence that the Debtor made a false representation of a material fact to the Plaintiff with respect to the Properties or the funds he used. Accordingly, the Plaintiff failed to sustain his burden of proof as to all elements required for a determination of nondischargeability under § 523(a)(2)(A).

As noted above, the parties' credibility was pivotal to determining the validity of the Plaintiff's claims. In the end, the Plaintiff proved believeable only with respect to the allegations concerning the funds used by the Debtor for the Mulvey Street property. The balance of his allegations against the Debtor were incompatible with the great weight of the evidence presented and constitute an unfounded extrapolation of the Debtor's one misdeed.

## VI. POST-TRIAL PLEADINGS

As discussed in the Introduction of this Memorandum, a further dispute between the parties arose following the trial regarding the Court's Turnover Order which required the Plaintiff and his attorneys to return to the Debtor all of his closing documents in their possession. On July 2, 2014, the Plaintiff's former attorney, Eugene Summers, Esq., filed an affidavit in which he attested that he never had possession of the Debtor's personal documents and that he had returned his original file to the Plaintiff in 2009. Also, on July

2nd, the Plaintiff's current counsel, Attorneys Richard Gottlieb and Alex Hess, filed a "Certificate of Compliance" in which they certified that they had complied with the Turnover Order.  On August 21, 2014, the Debtor filed "Defendant's Motion for Relief for Plaintiff's Failure to Comply with Court Order Re: Return of Defendant's Personal Papers" (the "Post-Trial Motion") in which he alleged that Plaintiff's counsel failed to comply with the Turnover Order.  As a result of this failure, he argued, the Plaintiff should "not be allowed to argue [that] there is no documentary evidence showing that monies spent by the [Debtor] during 2002-2006 from the plaintiff's money market account benefitted the Properties or the plaintiff, while at the same time stealing and then withholding or destroying the very same evidence that the defendant could have used to rebut these allegations."  The Plaintiff filed a reply reiterating all parties' compliance with the Turnover Order.

The Court finds that the Post-Trial Motion does not set forth any allegations which are relevant to a disposition of this Adversary Proceeding.  As explained above, the Court has accepted the Debtor's contention that the Plaintiff's seizure of his receipts explained his inability to document his expenditures and ruled in favor of the Debtor on all claims but for the Embezzlement Claim.  In that respect, the Debtor has obtained the substantive relief requested in the Post-Trial Motion.  With respect to the Embezzlement Claim, the Court has also found that no written compensation agreement between the parties ever existed.  Moreover, the Debtor made no specific reference in either the Turnover Motion or the Post-Trial Motion to the alleged written compensation agreement.  There is simply

no document the Plaintiff could turn over which would expunge the Debtor of his embezzlement.  Accordingly, a turnover by the Plaintiff of further records would yield nothing helpful to the Debtor with respect to the Embezzlement Claim.  The Post-Trial Motion is denied as superfluous and moot.

## VII. CONCLUSION

For all of the above stated reasons, the Court finds that, other than the Embezzlement Claim, the Plaintiff failed to establish that the Debtor owes him any debt, let alone a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A) or (4).  With respect to the Embezzlement Claim, the Court finds that the Plaintiff established by a preponderance of the evidence that the debt owed to him by the Debtor, in the amount of $62,200, is the result of embezzlement and is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).  The Court shall enter a judgment in favor of the Plaintiff and against the Debtor with respect to the Embezzlement Claim under § 523(a)(4).  The Court shall enter a judgment in favor of the Debtor and against the Plaintiff with respect to the Plaintiff's remaining claims under § 523(a)(2)(A) and (4) to the extent they are not otherwise moot as set forth above. The Debtor's Rule 52(c) motion is denied with respect to the Embezzlement Claim as the Court has found that the Plaintiff has met his evidentiary burden with respect to that debt.  That

motion is moot with respect to the Plaintiff's remaining claims.  The Post-Trial Motion is

denied as moot and superfluous.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: September 24, 2014

cc: Gary W. Cruickshank, Chapter 7 Trustee